Thank you, Your Honors. May it please the Court, Rob Hockman for TD Ameritrade. I'm going to begin today with the economic loss issue, then I'll turn to the reliance question. And of course, at any time, if this Court has questions about either the B-2 or the C-4 issues that have also been briefed, I'm happy to answer those questions, but I don't plan to address them myself. So starting with economic loss. Respectfully, there is no way to square this Court the trial court's ruling on remand with this Court's prior opinion. In this case, at the risk of stating the obvious, this is a securities fraud claim. And in the prior appeal, this Court correctly acknowledged that in a securities fraud claim, economic loss is an essential element of the claim. No economic loss, no valid securities fraud claim. Now, that element, economic loss, requires plaintiffs to prove that they are financially worse off than they would have been but for the supposed misrepresentation. So how does that requirement play out when the securities fraud allegation is, as it is in this case, that we said we would seek best execution, but actually we allegedly sought to maximize our payment for order flow? Again, in Ford 1, this  case, the Court said that economic loss is the difference between the price at which customers' trades were executed and the better price allegedly available from another trading source. Now, what happened on remand is that the plaintiffs convinced the trial court to just set all that aside. And you can see that rather vividly in their opening, in their response brief in this Court. Plaintiffs expend great effort at the beginning of their brief to suggest that we have conceded, for purposes of class certification, that, and they say every trade, that's at page 4 of their brief, that issue in this case, or 100 percent of the trades at issue in this case, that's what they say at page 6, during the putative class period, did not receive best execution. Respectfully, that is not accurate, Your Honors. It's not how their own expert understood the case. It's not how they framed the case. It's not how the district court understood the case. And it has never been our position. The evidence from both parties' experts throughout this case was clear. Most orders received at least as favorable a price as was available from any trading venue. That is, we know, we know that a large proportion of the trades at issue in this case, according to plaintiffs' own expert, those, those trades received the best available price from any trading venue, and, and this is critical, this is that Docket 189, Exhibit 2C. It's their experts' rebuttal report at page 20. The whole point of going through the exercise, trying to figure out which trades did receive the best available price and which didn't, was to figure out which orders are part of this case and which orders are not part of this case. All of the orders that received the best available price were out of this case. That, that means, that means that commissions cannot be, have not been understood as economic loss and cannot be economic loss. That's a concession. What we conceded, in fact, is far more modest and irrelevant here. We conceded that whether we satisfied our duty to seek best execution is subject to class-wide proof, but as this Court recognized in Ford I, and this is really, I think, the most important line from the Court's prior opinion, a violation of the duty of best execution does not necessarily cause a customer economic loss. That's at page 624 of this Court's opinion. And recall, this Court said that, even though plaintiffs had argued that commissions were economic loss in the prior appeal. Now, true, this Court did not expressly discuss that argument, but the logic of the Court's reasoning projected treating commissions as economic loss just as much as if it had been expressly stated, because you cannot believe both that violating the duty to seek best execution does not necessarily cause economic loss, which is what this Court said, and that And also believe that commissions, which were paid on every trade, at the time, are, in fact, economic loss. Those two do not go together, and they are logically inconsistent. And so nobody has offered a way to transform commissions into economic loss, and just waving your hands about commissions doesn't do it. And there's a good reason why that's so, because commissions have nothing to do with where an order is routed. And if an order was routed to a trading venue that provided the best available price, as I've explained, both experts conceded happened quite frequently in this case, then the customer got precisely what they paid for. An order that was — that they actually entered was executed, and they got the best available price. That's what they pay commissions for. And the churning cases that they rely upon only illustrate the disconnect in this case that's missing, because in the churning cases, the fraud is executing trades that were never ordered. Of course, when you execute a trade that was never ordered, commissions are part of the economic loss, because you shouldn't have paid commissions at all. So you can stop there. Whether as a matter of law of the case or as a matter of making explicit now what logically followed from this Court's prior ruling, commissions do not address the individualized issues inherent in determining economic loss in a best execution case, but it only gets worse if you don't stop there for plaintiffs. Because if commissions are relevant at all, they just layer on top of all the individualized issues that were previously part of this case and that were — that this Court has already said preclude classification in this case, and plaintiffs have no response to that at all. And given TD Ameritrade's discount broker status, the sort of netting out of what you'd have to do to figure out on an individualized basis whether a particular customer was better or worse off using TD Ameritrade is almost guaranteed to result in large numbers of uninherited class members, which raises that whole complicated question as well. So if the Court has no further questions, no questions on economic loss, I'll turn to why I think this case actually is an appropriate case to clarify the reliance issue and the affiliated issue, but I want to give the Court an opportunity if they're interested in probing. Okay. So turning to — turning to reliance, I think — I think certain background principles of law are agreed here. An omissions case gets the presumption of reliance. A misrepresentation case does not get the presumption of reliance. Everybody agrees about that. That has long been understood to be the law. Numerous circuits, including this Court in Vervacchi, has so ruled that the affiliated presumption of reliance applies only in omissions cases for good reason, right? Because it's very — it would be very difficult for a plaintiff to present evidence that he relied on something that was never — that never happened, right? Whereas when there's a misrepresentation, it's straightforward. Did you see it? How did you react to it? How did it figure into your decision to act? So the question is, is this a misrepresentations case? And respectfully, I think the record is clear on this. The complaint, you can look at A47 to 48. Deposition testimony, A261, 275, and 523. Class cert motion itself, A75, as well as numerous documents referenced throughout the litigation, all point in the same direction. This case is about the falsity of T.D. Ameritrade's affirmative statements regarding best execution. Now, the law has advanced meaningfully since we were last here on this issue, and that's because the Second Circuit in Schwab and the Northern District, California, and Crago have both applied that general background rule to this very case, indistinguishable case. And, in fact, the Second Circuit in Schwab explicitly rejected the very gambit plaintiffs are trying here, where they — where the plaintiffs re-characterize an allegedly false statement as the supposed omission of the truthful alternative. We said we would seek best execution. Oh, but really the problem is we omitted to say we're maximizing payment for order flow. Well, that's — that gambit doesn't work, because what we omitted is just demonstrating the falsity of the — of the misrepresentation. And the Second Circuit and — and Crago both rejected that move. And, of course, as a practical matter, it's perfectly straightforward in this case how plaintiffs could prove whether or not they relied on the statement that we seek best execution. And — and part of the reason to join the Second Circuit and — and clarify — is because this case is the perfect vehicle to do so. The named plaintiff in this case continued to trade with us even after asserting that we were not seeking best execution. So you couldn't have a more clear example. And never mind the problems that came — that creates for a class certification case where the named plaintiff is — claim is — is doomed, I think, based on his own conduct and his own admissions. He did not rely on these statements. So for all those reasons, we think you should take the opportunity to make clear that in this sort of case, in an order-routing case like this, reliance is not presumed when there are affirmative statements. But you would agree we don't have to address that if we focus on the economic loss. No doubt. And you were to win on that basis. That's true. But I want to emphasize that if you do do that, I think it's — particularly in light of the litigation history in this case, it should be — this Court should make clear in its order that class certification is foreclosed. It's not — it's not open-on-remand. It is — it is — it is done. Well, are those alternative possibilities really before us? Well, the — the B-2 and C-4 possibilities, I think — I think they — I think they are, because I think the Court has made clear its position. And this Court should take the opportunity, rather than continue to bounce back and forth, the — the need to — Well, making clear its position enough to give us jurisdiction? I think in the 23-F, the whole order comes up. And it's part of the order, right? It's an alternative — it's an express alternative basis for the order. And I do think that it is within the scope of this Court's authority, especially when the basis for a B-2 — But when you say it's an alternative basis for the order, you mean for the order certifying a class? Yes. So do you think the judge certified an issues class? I think the judge has — has made clear that his — his order certified — he has not, in fact, certified an issues class, but he has made clear that if — if this Court were to vacate the B-3 class he certified, he would — it would transform his — his order into a C-4 class, unless this Court said you can't do that. And that's why I think this Court should take the opportunity to say there's no rigorous analysis there, there's no — there's no basis for doing so, there's no added efficiency of a C-4 class in this case, because all you're going to get, right, is duplicative proceedings. And this gets into a little bit — this is part of the reason why a rigorous analysis is required. It gets into a little bit about what the plaintiffs have represented. They would try to show, if they went back and they had a C-4 case, to — to demonstrate that we did not satisfy our duty to seek best execution. What the plaintiffs have said is, remember, there are regulations out there governing this. Regular and rigorous review, you know, keep — keep monitoring the — the quality of your execution and full disclosure. That has been the regulators' approach to this issue. Plaintiffs don't like that approach, because it doesn't do them any good, right? What the plaintiffs say is, well, what we want to do is go in and — and evaluate every trade and see how often you missed the best available trade. And if we think you've missed too often, then we're going to say — we're going to ask the jury to say that you're not seeking best execution. Now, that's a different way of thinking about it. I don't think it's the best way to think about it, but — and I don't think the regulators think it's the best way to think about it. But the point is, if you're going to do that, you're already duplicating the highly individualized issues of economic loss that are going to be left for the subsequent proceeding after the class proceeding. So there's no efficiency here. I would like to go back to the jurisdictional piece again, because I'm a little bit confused and slower than you're talking. Is it basically your argument that because there's been a 23 — a Rule 23 class certification, that we're not jurisdictionally limited to the bases that were expressed by the district court and that we do have jurisdiction to just move on to C-4, even though there's been no finding specifically made by the — by the judge that there's an issues-based class or that — So I guess my view is I'm with you up until the last step. Well, that's because it may be wrong, but I'm just curious what your answer is. Yeah. No, my answer is I think the last step is where it breaks down. There has been a finding that he has made clear his position. He thinks there's a B-2 class, even though there's nothing left to enjoin, right? If this is a commissions case and we're not doing commissions, there's no going forward relief for anybody, right? So that's one problem. There are other problems with the B-2 that we've briefed. The fact that you're not doing commissions, you think, makes an injunction unavailable? Well, it makes an injunction — But if you start doing them again. It would — then — then you — then you'd have a case, right? Then you'd have a — then you'd have a basis to bring a new case against us. But it would have to be a new case. But if you stopped once they brought the case. Well, I mean, if there is a point it would — I mean, are injunctions entered sometimes when there's been cessation — Sure. — in regard against reinstitution of a policy? Respectfully, Your Honor, I think that on those situations, the Court would require a demonstration of a certain pattern or practice of avoiding the Court's jurisdiction, and there's no evidence of that going on here. We're not trying to evade any order. What's the record on why commissions are no longer — Well, there isn't much of a record here. The background on the way the business has developed over time is, as — again, this is just the regulators' approach playing out. Remember, order routing and payment for order flow has been the subject of enormous regulatory debate by participants in the parties. And what the — what the regulators have concluded is allowing for experimentation, allowing for payment for order flow to — to operate in the system, requiring full disclosure and trending in the direction of full disclosure, which they did, again, just earlier this week, continuing to promote disclosure. The view was that that would lead to greater competition, greater performance, and — and lower costs to consumers. So that actually has been playing out in the industry. And TD Ameritrade is just one of the brokers who has gone away from a commissions-based model of brokerage precisely because the system is working exactly as the regulators intended. So I think that the C-4 question is — is one that's before this Court. The B-2 question is before this Court because there were specific findings by the judge that he's going — that he would do that. And having done that, I think this Court is available to review that and explain there is no basis for that. This case has been going on for years and years and years. And it is stalled on this question because of a judge who has, I think, sort of a preconceived notion of how this case could go that just doesn't conform with the law. So respectfully, we request that you enter an order precluding class certification in this case going forward. Very well. Thank you for your argument. Mr. Porat, we'll hear from you. Thank you very much, Your Honors. Nicholas Porat, Levy & Kosinski on behalf of the plaintiff and the class. I'll take the order of arguments in the order my colleague presented, if that's acceptable to the Court. So I'll start with the economic loss reliance issue — sorry, predominance issue. And I just want to start off by addressing what my friend just said, which came as a surprise to me when he said that they did not concede that, for the purposes of class certification, that their routing algorithm violated the duty of best execution because they clearly did. And that's been — they've resisted — they've prevented any discovery on the matter of the routing algorithm and whether — and that might have been helpful in terms of seeking certification of the class the first time around on the first definition, but they deliberately excluded and prevented discovery on that issue and have done in the 10 years that these cases have been proceeding. And now to come up here, they've prevented any discovery as to what the algorithm is, how it was prepared, how it routes trades, how it categorizes trades presented by their customers. And their entire basis for saying that is that, for class certification, that's irrelevant because we concede that we don't — the only question is economic loss. We concede that our routing algorithm did not comply with the duty of best execution. That's crystal clear on the record. So to now stand up here today, 10 years into the case, and say, oh, no, no, no, that's all up in the air. We don't concede that at all, again, is quite surprising. And, you know, I'll have to see — I'll address it after this hearing as to what consequences that may have in the event that this case is remanded down or when this case is remanded to district court as to what that means in terms of discovery. But the basis of this motion, for the purposes of this motion for class certification, the following facts are either conceded by defendants or are properly pleaded and are admitted to be capable of class-wide proof. That TD's routing algorithm failed to meet the duty to seek best execution. And when I talk about — my friend also misrepresented to the court, I'm sure, inadvertently, what the duty of best execution actually means. He — it breached — therefore, because they used their routing algorithm for essentially every trade and every trade that is part of this class, that means they breached their duty to seek best execution on every single trade during the class period. Every single one. And this breach was from a practice that was not disclosed to customers, couldn't have been discovered by customers. And so, nonetheless, on every single trade — and we're only talking about executed trades now, the prior class also included some unfulfilled trades, we've taken those out, but reacting to this court's prior ruling — they received a commission as if they complied with their duty of best execution when they didn't. And that payment of a commission is an out-of-pocket payment by every customer and every class member for a service that you did not receive. And so, that is just self-evidently — Is there — so, forgive me if I'm not following you. Are you suggesting there is an economic loss in every trade? Yes. And would you explain your theory on that to me? Because you paid — And maybe you just did, but if you do it again — Sure. I'll do my best to be as clear as possible. So, you paid — I'm going to choose a figure — the amount of commissions varied depending on customer, but I'm going to use the sum — $10 I think was pretty typical, or $9.99 in marketing speak, but I'll say $10. So, you pay $10 to TD Ameritrade to receive a bundle of services. Some of that is research, some of that — well, to execute the trade, some of that is use of the online portal to be able to place your trade. Although — but an important and material part of the services you purchase is that TD Ameritrade, when it executes its trade, will comply with its duty to seek best execution. And that duty is not just to obtain the best price, although that is part of the duty, it's to seek the best price. You could route the trades randomly, and a certain percentage of those trades will receive the best price. There's no way that a trade routed randomly complies with the duty to seek best execution. So, assuming you get lucky and you get the best price, what is the economic loss? The economic loss is you've still paid for a service you did not receive. I mean, I think it's true — you can think of other cases of services where, say, for instance, a company that retains an auditor and pays an audit fee to obtain an audit that's compliant with GAAS and professional standards, and the audit firm still provides an opinion, but does not conduct its audit in accordance with GAAS. Now, it still gets an audit opinion, and if it gets lucky and its financial statements do not contain any error, there's been no error in its financial statements, but it still, I think, has a loss. It has still paid the audit firm, for instance, for services that it did not receive. And that's a loss under any circumstances. I mean, you have paid out money out of your pocket, you are $10 worse off, and you did not receive $10 worth of services. And the Supreme Court in Randall says the measure for out-of-pocket loss is the fair value of what you paid, which here is the commission, say $10, versus the fair value of what you receive in return, which is the services provided by TD Ameritrade. And we submit, and we will attempt to prove, and I think it's certainly capable of proof on a class-wide basis, that they did not receive $10 of services back in return because they did not receive execution that was compliant with the conceded duty to seek best execution. Now, how does that square with the first opinion, where at that time I thought we were thinking that the economic loss would be the difference between the price that should have been received and the price that was received? Well, I think that's another economic loss. It could be recoverable. Are you fighting with that conclusion when you say, even if they got the best price, they still have a loss? Correct. I mean, obviously we respectfully disagree with the court's opinion, but we accept that proving that element of economic loss suffered is not capable of being proven on a class-wide basis. So we are not attempting to prove that on a class-wide basis. But the commission, on the other hand, is eminently capable of being proven on a class-wide basis because it will be the same for every single class member who had a trade executed during the class period. And so defendants have argued here today, you know, that that's not recoverable, just as a matter of law. Point one, I think they're incorrect. Commissions are clearly capable of being recovered as a loss. Yes, and usually in the context of churning cases, but not always. And in any event, the contents of economic loss for fraud cases is much broader than what defendants would suggest. Is your argument that they are conflating damages and economic loss in a manner that's not appropriate? Because, I mean, at the end, I mean, I look at this and listen to this argument, and just as an old trial judge, I keep thinking, well, man, we're just moving this thing to a different pot, right? Because you've got maybe some economic loss. Maybe if you establish that, it doesn't get you over the hurdle of individualized consideration of that particular matter, because then we still are going to have to do an individualized damages determination. Or am I just like, have I just missed the boat? Well, I have two responses. First, the law is crystal clear that individualized damages calculations is not sufficient to defeat class certification. So that's point one. So yes, each individual class member is not going to have identical damages. This is not like a case where you'd have, say, a statutory damages amount where everyone gets $1,000. It's not that. But neither is any securities class action. And securities class actions have been recognized in the Supreme Court as particularly suited to class certification. So depending on the number of trades, then each individual class member will have a different amount of damages. That is true. Right, but that type of damages can be actually just determined from looking at what are those number of trades. But, you know, ordinarily, money damages require you to show that you suffered a loss, a genuine loss, like out-of-pocket loss, which is kind of what I thought Ford once said. Well, but as I, you know, I'll repeat again, they have suffered an out-of-pocket loss. If they paid a commission, that's $10 out of their pocket. They do not receive $10 worth of services back. What that difference is will be determined by the jury. Whether it's the entire $10, whether it's $3, $2, you know, $5, that can be determined. Once that is determined, it can be applied. It's a mathematical calculation to apply across trades as to what the damages are. I've got a second issue that's more of a procedural thing. After Ford won and after years and years and years of litigation, there's been no second amended complaint ever offered up here. And if I look at the class definition and allegations, there's an inexact match-up between where the district judge is going as he makes these class certifications that doesn't match very well with actual claimed relief in the first amended complaint. And I'm wondering why, in light of Ford won, that there wasn't some effort to recast the complaint to match the claims that were actually being made to the district judge. I mean, because ultimately when this thing is submitted to somebody to try, it's got to be squared up. And it doesn't look very square to me. And this is more, once again, more maybe a district judge kind of thinking on my part. But when I looked at it, I'm just not seeing where it all, it doesn't seem to fit together exactly. Well, we certainly anticipated an amended complaint ultimately being filed. So the question really was we wanted to move quickly to bring back the class certification issue before the court. We felt that it was adequately covered by the complaint as it initially, as it currently is. The district court obviously agreed. That's obviously something that could be cured very readily by amendment. So, I mean, if that is the issue, we would obviously cure by amendment. As I said, I think it's adequately covered by the current complaint. Thank you. So... I'd also just want to quickly talk. So, I recognize my time is running down. I will talk briefly about affiliated oot, if that's the line. Before you go to that on this question, you say the jury would determine the damages under the way you see the case would proceed. And it wouldn't necessarily be the full commission. Correct. That would be subject to expert, presumably expert testimony as well on the merits. Would it vary by customer? I don't see why it would vary by customer. I mean, I think the value, it's the fair value of what the execution compliant with the duty of best execution consists of, which presumably can be valued by experts. I mean, there is a data point already in the record, which is after the current plaintiff learned of the practices of TD Ameritrade or the alleged practices of TD Ameritrade at the end of September 2014, he negotiated a reduction in his commission. So, although defendants talk about how he carried on trading with TD Ameritrade, he negotiated a reduced commission from $9.99 per trade to $6.99. So, I'm not saying that's necessarily guaranteed as a delta, you know, as a damages, but that's an indication of sort of the value of this particular plaintiff, this particular individual put on it. And experts would be able to, and you can look at, there are experts would be able to look at different commissions charged by different brokers at the time and would be able to come up with a value of what this consisted of. So, would that calculation be done without consideration of whether or not a particular member of the class received best priced or not? Does it matter? I don't think it matters because it doesn't, as I said, you could do that, you know, that would occur even if the trades were routed randomly. Some of them will receive the equivalent execution. So, what matters is that they were not getting what they were being paid for and that was based on a fraudulent, nondisclosed practice of defendants. And that's enough. You know, the case law in the circuit, the case Arthur Young v. Reeves, is very clear that, you know, the causation in security fraud cases, you know, the loss just has to be somehow related to the fraud. And I think here, no question, it's somehow related. There's sufficient of a nexus to establish that this out-of-pocket loss is a loss. And then the rest is this calculation of damages. Both of you, both counsel have addressed the issue of adequacy of the class representative. Is that issue even before us at this point? No, well, we didn't. You did in response to what they said because I just heard you say that we reduced the trade from $999 to $699. That sounds to me like an adequacy explanation of the representation claim. Well, I was responding to the comments that was made after the class period. Reliance piece of the representation. Yes, so it was made after the class period. Conduct of what, how the class member may have reacted after the end of the class period is typically not relevant in security fraud cases. You have all sorts of instances where people purchase stock where there's a misrepresentation. They continue to hold the stock even after it's revealed. That's not relevant. So, because you really get into a second set of decisions. So, adequacy is not before the court. The court found, district court found adequacy the first time around. It came up. We went back down again. It found adequacy the second time around or reaffirmed adequacy and it's come up. It's not mentioned anywhere in their briefs. I don't think there's any question about adequacy of the class representative here. Go ahead. What did you want to say about reliance in your last minute? I'll say very quickly, and I do want to say something about C-4-2. All right. Well, you don't want. Go ahead. However you want to use your time. Affiliated OOT is clearly satisfied here. This court has found that the claims in this very case involve omissions, primarily omissions. That was in Zola and also in the related case of Lewis v. Scottrade. Not addressed by defendants. So, the case, the court in Newton 2, which is much cited by defendants, mostly on the loss causation issue, but they never cite the fact that it held that affiliated OOT reliance presumption applied in that case in connection with an undisclosed. Which Newton? You're talking about Newton? Newton 2, yes, Your Honor. And that's at pages 176 to 177 of the opinion. And then, as we've argued consistently, affiliated OOT is very comparable in the facts. Very similar. And of course, it established the presumption in the first place. That was a uniform, undisclosed practice applied to take advantage of the plaintiff. Your time has expired. What did you want to say about C-4? I think the answer, the C-4 is, I don't think it's before the court right now. The court has not, definitively not certified a C-4 class. We think this eminently qualifies for a C-4 class if B-3 is found not to be applicable. There's no question it would materially advance the prosecution of this litigation. To have class-wide, it's subject to class-wide proof on the question of whether that, the key fact is whether their algorithm complied with the duty to seek best execution or not. And whether they knew about it. Those are the core facts. And that is due to common proof across the entire class. To have to say you have thousands of cases, we'd have to individually prove that single element, which is going to require, and does require, detailed analysis of the trading practices and the trading results. Because part of what the duty to seek best execution requires is rigorous review of your trading results. The only way to see if TD Ameritrade was complying with that aspect of duty-based execution is to see what the results are. So to say you can have thousands of cases, hundreds of thousands of cases, with expensive experts presenting the same complicated technical evidence to a jury, obviously it raises the issue of inconsistent jury verdicts. And obviously if defendants win on that, on a class-wide basis, the case is over. So that's clearly an efficient way of resolving these threshold issues if your honors decide that B3 class certification is not appropriate here. Which obviously we submit that the court's order was proper and should be upheld. And again, I appreciate your indulgence in letting me run over time. If you have any other questions. Thank you for your argument. Thank you. Well, your time has expired. We'll give you two minutes for rebuttal. Thank you, Your Honor. I'll be quite brief here. First, I want to just start with the economic loss point. Because I think, Judge Kovas, you're struggling with precisely the right question. The problem is this is a securities fraud case. And securities fraud has a specific economic loss requirement that's tied to the fraud. Commissions are not tied to the fraud in this way. And what they're trying to do is transform a securities fraud case into something more like a breach of contract or a breach of fiduciary duty case. Which, you know, that has its own set of problems, which this Court dealt with in Zola and Scott's trade. But you can't mix and match the elements like that. It's a securities fraud claim. And the economic loss requirement of a securities fraud claim requires a connection. And so it is important whether or not each trade resulted in the best available price. Because if it did, there isn't securities fraud. And, Judge Erickson, this goes to the confusion of remedy and damages. It might be the case, I mean, remedy and economic loss. It might be the case, an appropriate case, where there is a securities fraud claim made out, that disgorgement would be an available remedy in connection with commissions. But it is not. Disgorgement is not economic loss. That's in a securities fraud case. So that's why I began the whole argument with reframing that this is a securities fraud case, because they're trying to transform it into something else. What about the question whether you acknowledge for purposes of certification that the duty was breached? We acknowledge only that the duty, the breach of the duty could be shown by class-wide evidence. But economic loss is, zeroes in on the price received in a way that's different than the question of the duty to seek best execution, which is holistic, as this So that's why what we conceded is that the duty, whether we could seek, whether we were seeking the duty of best execution is subject to common proof, but economic loss, which zeroes in on the price actually received and is an essential element of the claim in this case, that cannot be proved by class-wide evidence. I want to very, very quickly just explain that on the C-4 question, I think it's without resolving the reliance question. That's crucial, because there are numerous cases. In a fraud case, if reliance is individualized, there's no C-4 availability. And that's not Well, what do you say about Newton and Zola, then? Well, on Zola and Scottray, those are SLUSA cases, and this Court said over and over and over again in those cases that SLUSA is indifferent to whether it's an omission or a misrepresentation. On one occasion, it used, it changed the phrase misrepresentation or omission to simply omission, but it's even in that case, even in that occasion, it's very clear, it's referring to the inverse problem that Schwab and Crago have already said doesn't transform a misrepresentation. Which case are you referring to? I think that's in Zola. All right. What about Newton? And Newton, I think, I think respectfully, I think Newton just has, we disagree with Newton on the question of reliance. Now, Newton had a slightly different factual setting than we have. I think that the record we have clear, especially with respect to the named plaintiff, points and makes more clear, but of course, Newton disagrees with, you know, with Crago and Schwab as well, so. All right. Thank you for your argument. Thank you to both counsel. The case is submitted, and the Court will file a decision in due course.